IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 18-cv-1922-WJM-NYW

UNITED CANNABIS CORPORATION, a Colorado Corporation,

Plaintiffs,

v.

PURE HEMP COLLECTIVE INC., a Colorado Corporation,

Defendant.

---

ORDER DENYING DEFENDANT'S EARLY MOTION FOR
PARTIAL SUMMARY JUDGMENT

---

United Cannabis Corporation (which refers to itself as "UCANN") sues Pure
Hemp Collective Inc. ("Pure Hemp") for infringement of UCANN's patent, U.S. Patent
No. 9,730,911 ("911 Patent"), which issued on August 15, 2017.  Currently before the
Court is Pure Hemp's Early Motion for Partial Summary Judgment.  (ECF No. 32.)  Pure
Hemp argues that all of the patent claims asserted against it are invalid, and therefore
requests a ruling to that effect, "which will substantially reduce the number of issues
before the Court in this case."  (*Id.* at 1.)  Indeed it would—because it would end the
case.  For the reasons explained below, however, the Court finds that Pure Hemp is not
entitled to summary judgment on this record.

## I.  LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the
movant shows that there is no genuine dispute as to any material fact and the movant is
entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986).  A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim.  *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001).  An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.  *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial.  *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II.  BACKGROUND

Per the undersigned's Revised Practice Standards, the parties submitted statements of material fact and responses and replies thereto.  (*See* ECF No. 32 at 1–3; ECF No. 36 at 6–10; ECF No. 38 at 3–4.)  However, the Court finds that the 911 Patent itself is the only evidence relevant to the challenges Pure Hemp raises in its current motion.

The 911 Patent addresses itself to the field of cannabinoids—various chemicals derived from the *cannabis sativa* plant—for human consumption.  The patent says that

> [t]here presently exists the need to provide more effective and safer *cannabis* extracts for various medical uses, extraction methods that provide unique active compounds that are useful to treat pain and various medical conditions. Additionally, presently known extraction procedures do not provide the desired active ingredient(s) for the particular medical purpose.  The present invention overcomes these limitations and provides other related advantages.

911 Patent at 1:32–39.  To this end, the "Summary of the Invention" portion of the specification announces that the invention covers four areas:

1.  "an extract comprising a mixture of at least 95% total cannabinoids, and at least one terpene/flavonoid," *id.* at 1:43–45;[1]

2.  "[specific] formulations containing the extracts according to the invention," *id.* at 1:63–64;

3.  "a method for preparing cannabis juice," *id.* at 3:4–5; and

4.  "a method of relieving symptoms associated with" various medical conditions, *id.* at 3:15–19.

However, it appears the Patent was substantially narrowed during its prosecution without a corresponding update in the specification, because the Patent ultimately claims only the first two types of inventions.  *See* Claims 1–36.

As to those claims, every independent claim describes "[a] liquid cannabinoid formulation, wherein at least 95% of the total cannabinoids is" a specified cannabinoid or combination of them.  *See* Claims 1, 5, 10, 16, 20, 25.  The dependent claims mostly add requirements for terpenes and/or flavonoids.  *See* Claims 2–4, 6–9, 11–15, 17–19, 21–24, 27–30.  Claim 33 addresses itself to any of the independent claims and adds that the required liquid is "formulated for oral, sublingual, buccal, or topical administration."

---

[1] The Patent describes terpenes as "organic hydrocarbons that are the building blocks of cannabinoids," which supposedly "act synergistically with the cannabinoids to provide a therapeutic effect."  *Id.* at 6:11–17.  The Patent does not distinguish terpenes from flavonoids.  Merriam-Webster Online defines "flavonoid" as "any of a large group of typically biologically active water-soluble plant compounds (such as the anthocyanins and flavones) that include pigments ranging in color from yellow to red to blue and occur especially in fruits, vegetables, and herbs (such as grapes, citrus fruits, peppers, and dill)."  *See* https://www.merriam-webster.com/dictionary/flavonoid (last accessed Apr. 15, 2019).

### III.  ANALYSIS

Through infringement contentions, Pure Hemp learned that UCANN accuses Pure Hemp of infringing Claims 10, 12, 14, 20–22, 25, 27, 28, 31, and 33 of the 911 Patent.  (ECF No. 32 at 1.)  Pure Hemp attacks all these claims under one theory of invalidity, and then alternatively attacks Claim 31 alone under a separate theory of invalidity.  The Court will first address the argument against all of the asserted claims, and then address the separate argument against Claim 31.

**A.     All Asserted Claims**

1.     The "*Alice*" Patentability Test

Pure Hemp's motion raises a "patentability" challenge to the asserted claims of the 911 Patent, *i.e.*, whether those claims are directed at something the Patent Act deems patent-protectable.  See 35 U.S.C. §§ 1 *et seq.*  The following principles are therefore relevant.

The Patent Act provides that "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title."  35 U.S.C. § 101.  The Supreme Court has "long held," however, "that this [broadly worded] provision contains an important implicit exception: Laws of nature, natural phenomena, and abstract ideas are not patentable."  *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (internal quotation marks omitted).

"[D]istinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts" first requires a court to "determine whether the claims at issue are directed to one of those patent-ineligible concepts."  *Id.* at 217.  If the answer is no, the inquiry ends; but if the

answer is yes, a court must then determine whether the claims in question nonetheless

offer "an inventive concept—*i.e.*, an element or combination of elements that is

sufficient to ensure that the patent in practice amounts to significantly more than a

patent upon the ineligible concept itself." *Id.* at 217–18 (internal quotation marks

omitted; alterations incorporated).  This second inquiry requires the court to "consider

the elements of each claim both individually and as an ordered combination to

determine whether the additional elements transform the nature of the claim into a

patent-eligible application." *Id.* at 217 (internal quotation marks omitted).

The foregoing two-part inquiry is often known as the "*Alice* test."  A court may

apply the *Alice* test at an early stage in the case.  *See, e.g.*, *Cleveland Clinic Found. v.

True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017), *cert. denied*, 138

S. Ct. 2621 (2018); *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1373–74 (Fed.

Cir. 2016), *cert. denied*, 137 S. Ct. 242 (2016).  But the second inquiry, in particular,

sometimes requires the court to consider whether claim limitations are "well-understood,

routine and conventional to a skilled artisan in the relevant field."  *Berkheimer v. HP

Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018).  If so, the court is faced with a fact question.

*Id.*  If it is a genuine dispute of material fact, resolution at the pleading phase is not

appropriate.  *See, e.g.*, *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d

1121, 1129 (Fed. Cir. 2018); *Berkheimer*, 881 F.3d at 1370.  The Court presumes the

same is true where a defendant moves for early summary judgment (as here), but the

motion does not dispel a genuine dispute of material fact.

2.   Potentially Relevant Precedent

The Court begins by summarizing certain Supreme Court and Federal Circuit

decisions in which those courts have examined questions of patentability in roughly

similar contexts.

In *Funk Brothers Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127 (1948), the inventor discovered, contrary to agriculture industry assumptions, that certain forms of nitrogen-fixing bacteria could mix with each other without inhibiting their nitrogen-fixing capacity. *Id.* at 129–30. This was useful because it allowed farmers to "inoculate" various types of seeds (*i.e.*, prepare them for more effective growth) with a single bacterial mixture, rather than buying a seed-specific unmixed culture designed for each type of seed. *Id.* at 130.

The Supreme Court held the new mixture unpatentable:

> [P]atents cannot issue for the discovery of the phenomena of nature. The qualities of these bacteria, like the heat of the sun, electricity, or the qualities of metals, are part of the storehouse of knowledge of all men. . . .
>
> Discovery of the fact that certain strains of each species of these bacteria can be mixed without harmful effect to the properties of either is a discovery of their qualities of non-inhibition. It is no more than the discovery of some of the handiwork of nature and hence is not patentable. The aggregation of select strains of the several species into one product is an application of that newly-discovered natural principle. But however ingenious the discovery of that natural principle may have been, the application of it is hardly more than an advance in the packaging of the inoculants. Each of the species of root-nodule bacteria contained in the package infects the same group of leguminous plants which it always infected. No species acquires a different use. The combination of species produces no new bacteria, no change in the six species of bacteria, and no enlargement of the range of their utility. Each species has the same effect it always had. The bacteria perform in their natural way. Their use in combination does not improve in any way their natural functioning. They serve the ends nature originally provided and act quite independently of any effort of the patentee.

*Id.* at 130–31 (citation omitted).

Decades later, in *Diamond v. Chakrabarty*, 447 U.S. 303 (1980) ("*Chakrabarty*"), the inventor was studying bacteria that break down hydrocarbons (useful for cleaning up oil spills) and faced a problem somewhat resembling that addressed in *Funk Brothers*— namely, that mixtures of different strains of bacteria, "each [strain] capable of degrading one component of the oil complex," were less effective by virtue of being mixed. *Id.* at 305 n.2.  The inventor in *Chakrabarty*, however, did not solve the problem by finding a way to create an effective mixture of naturally occurring bacteria.  Rather, he genetically engineered a single bacterium capable of doing the hydrocarbon-degrading work of four naturally occurring strains. *Id.* at 305 & n.1.

The Patent and Trademark Office granted a patent on the method of genetically engineering the new bacterium and on a method for distributing it on oil spills, but refused a patent on the new bacterium itself. *Id.* at 305–06.  The Supreme Court reversed this refusal: "[In] contrast [to *Funk Brothers*], the [inventor] has produced a new bacterium with markedly different characteristics from any found in nature and one having the potential for significant utility.  His discovery is not nature's handiwork, but his own; accordingly it is patentable subject matter under § 101." *Id.* at 310.

More than twenty years later, the Supreme Court returned to this topic in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012).  There, the inventors had discovered that concentrations of a certain metabolite in the bloodstream within a certain measurable range correlated with an effective dosage of a thiopurine (used for treating autoimmune diseases), whereas metabolite concentrations below that range correlated with ineffectiveness and concentrations above that range correlated with potentially dangerous side effects. *Id.* at 73–74.  The resulting patents

essentially instructed doctors to measure the metabolite in the patient's bloodstream and then consider adjusting the patient's thiopurine dosage if the metabolites were above or below the specified range. *Id.* at 74–75.

The Supreme Court held that the claimed invention was unpatentable: "[The] patents set forth laws of nature—namely, relationships between concentrations of certain metabolites in the blood and the likelihood that a dosage of a thiopurine drug will prove ineffective or cause harm." *Id.* at 77. And the fact that the patents also included steps such as administering the drug and measuring metabolites was not enough to save them because those additional steps "consist[ed] of well-understood, routine, conventional activity already engaged in by the scientific community; and those steps, when viewed as a whole, add nothing significant beyond the sum of their parts taken separately." *Id.* at 79–80. This two-part inquiry—whether the patent claim addresses a law of nature, and if so, whether additional steps in the claim add anything significant— is what the Supreme Court systematized two years later into what is now the "*Alice* test." *See Alice*, 573 U.S. at 217 ("In *Mayo* . . . we set forth [the relevant] framework . . . ."); *cf. Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1126 (Fed. Cir. 2018) (referring to the *Alice* test as the "*Alice/Mayo* analysis").

One of the earlier Federal Circuit decisions to apply the *Alice* test, as recently formulated, was *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371 (Fed. Cir. 2015). In that dispute, the inventors

> discovered cell-free fetal DNA ("cffDNA") in maternal plasma and serum, the portion of maternal blood samples that other researchers had previously discarded as medical waste. cffDNA is non-cellular fetal DNA that circulates freely in the blood stream of a pregnant woman. Applying a combination of known laboratory techniques to their discovery, [the

> inventors] implemented a method for detecting the small
> fraction of paternally inherited cffDNA in maternal plasma or
> serum to determine fetal characteristics, such as gender.
> The invention . . . created an alternative for prenatal
> diagnosis of fetal DNA that avoids the risks of widely-used
> techniques that took samples from the fetus or placenta.

*Id.* at 1373.

At step one of the *Alice* analysis, the Federal Circuit found that "the claims are directed to matter that is naturally occurring," *i.e.*, cffDNA.  *Id.* at 1376.  At step two of the *Alice* analysis, the Federal Circuit found that the claimed procedures and techniques for isolating and amplifying paternally inherited cffDNA "were well-understood, conventional and routine" at the time the inventors made their discovery, and so "the method of detecting paternally inherited cffDNA is not new and useful."  *Id.* at 1377.  Consequently, the invention was "not directed to patent eligible subject matter and [was], therefore, invalid."  *Id.* at 1378.[2]

* * *

As the foregoing summary of case law suggests, the proper application of the Supreme Court's *Alice* standard is an evolving and sometimes hazy area of law.  Deciding whether a patent claim is "directed to" a law of nature is not as straightforward as the Supreme Court makes it sound in *Alice* itself.  Moreover, the Federal Circuit itself has remarked on the difficulty, at times, of distinguishing the first *Alice* inquiry from the second, *see, e.g.*, *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir.

---

[2] Through notices of supplemental authority (ECF Nos. 39, 47, 48), the parties have directed the Court's attention to the United States Patent and Trademark Office 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50 (Jan. 7, 2019); *Natural Alternatives, Inc. v. Creative Compounds, LLC*, 918 F.3d 1338 (Fed. Cir.  2019); and *Cleveland Clinic Foundation v. True Health Diagnostics LLC*, ___ F. App'x ___, 2019 WL 1452697 (Fed. Cir. Apr. 1, 2019).  The Court finds that none of these authorities inform the Court's analysis here.

2016); or distinguishing the two *Alice* inquiries (comprising a patentability analysis rooted in 35 U.S.C. § 101) from other common inquiries such as anticipation and obviousness (which are rooted in 35 U.S.C. §§ 102–03), *see, e.g.*, *Rapid Litig. Mgmt. Ltd. v. CellzDirect, Inc.*, 827 F.3d 1042, 1052 & n.2 (Fed. Cir. 2016).

    3.   <u>Application</u>

Despite the potential ambiguities, the Court is convinced under the current state of the case law that the challenged claims of the 911 Patent are not directed at unpatentable subject matter.

    a.   *Preliminary Observations*

At the outset, the Court notes that every claim in the 911 Patent describes a liquid formulation with partly specified ingredients, but no claim in the 911 Patent states a *purpose* or *use* for any of these formulations.  Pure Hemp does not challenge it on these grounds, however, and the patent's specification makes that purpose clear in any event.  Taken as a whole, the obvious thrust of the patent is a supposedly new means by which humans can consume cannabinoids so that those cannabinoids can produce the pharmacological effects they are known to have, thus (hopefully) treating or ameliorating various diseases and symptoms.  *See* 911 Patent at 1:32–39, 3:16–4:3, 10:5–24, 10:59–11:20, 14:4–18:17.  The Court thus keeps this purpose in mind as it evaluates Pure Hemp's *Alice* challenge.

Before proceeding further, however, it is helpful to understand that the 911 Patent does ***not*** claim any of the following:

- a process for extracting cannabinoids from cannabis plants—"[a]ny suitable method for extraction known in the art may be used," *id.* at 9:29;

- a process for making the "*liquid* cannabinoid formulation" required by

every independent claim, *see* Claims 1, 5, 10, 20, 25 (emphasis added)—
apparently any liquification method will do;

- a requirement with respect to the inactive ingredients within the
formulation—"any convenient pharmaceutically acceptable carriers,
diluents or excipients" are appropriate, *id.* at 7:51–53;

- a ratio between the cannabinoid portion of the liquid formulation and the
inactive ingredients;

- a process for ensuring that the "at least 95%" threshold has been met—
"methods of calculating cannabinoid content (as %) are well known in the
art," *id.* at 7:7–8; or

- a method for using any claimed formulation to treat any particular disease,
condition, or symptom.

It is further helpful to understand that, apart from the *claims*, the *specification* does **not**
assert either that:

- a threshold of "at least 95%" for various cannabinoids, or combinations of
them, has any clinical significance—the provenance of that percentage is
unexplained; or

- any claimed combination of cannabinoids making up the "at least 95% of
the total cannabinoids" in a liquid formulation is more effective than any
other combination in treating a particular disease or symptom.

The Court now turns to the patentability dispute as presented by the parties.

      b.    Alice*, Step One*

Every disputed independent claim is a "liquid cannabinoid formulation, wherein at

least 95% of the total cannabinoids" is some combination of one or more specified

cannabinoids. *See* Claims 10, 20, 25.  Most disputed dependent claims add either (1) a

requirement of "at least one terpene/flavonoid" as an additional ingredient, *see* Claims

12, 14, 21, 27; or (2) a directive that "the formulation comprises no more than 4%

terpene," *see* Claims 22, 28.  The only other relevant disputed dependent claim, for

present purposes, is Claim 33, which narrows the formulation in Claims 10, 20, and 25

(among others) to one "formulated for oral, sublingual, buccal, or topical administration."

Accordingly, the question at step one of the *Alice* analysis "whether [these claims] are

directed to one of [the] patent-ineligible concepts," that is, "laws of nature, natural

phenomena, and abstract ideas."  573 U.S. at 217.

Pure Hemp argues that these claims are "directed to" the unpatentable natural

phenomenon of the specified chemical compounds (cannabinoids, terpenes, and

flavonoids), as if UCANN is trying to secure a monopoly on use of these compounds.

(ECF No. 32 at 5–12.)  UCANN counters that "the claims are not directed to laws of

nature or natural phenomena because they claim human-modified liquid formulations

that require converting solid cannabinoids into a different state with markedly different

physiological characteristics."  (ECF No. 36 at 12.)  UCANN's counterargument contains

two components: (1) the liquid formulation itself, which is supposedly novel; and (2) the

alleged "markedly different physiological characteristics" of the liquid (which the Court

takes to mean physiological *effects*—a liquid does not have a physiology).

The Court need not and does not address the second of UCANN's arguments

because the Court is persuaded by the first.  Pure Hemp has failed to establish beyond

genuine dispute that a liquefied version of cannabinoids and related chemicals at the

concentrations specified in the 911 Patent is anything like a natural phenomenon.  It may be true, as Pure Hemp insists, that cannabinoids in nature can take the form of a resin; that a resin can be highly viscous; that a highly viscous substance may at times be considered a liquid; and therefore it is logically possible that cannabinoids in nature might appear in a form that could, in some sense, be deemed a "liquid."  (ECF No. 38 at 6–7.)  Even accepting as much, the 911 Patent specifies threshold concentrations of cannabinoids and related chemicals.  Pure Hemp nowhere claims that these precise concentrations, or anything close to them, occur in liquid form in nature.  Accordingly, UCANN's claims are not restatements of "the handiwork of nature," *Funk Brothers*, 333 U.S. at 131, "but [UCANN's] own [handiwork]," *Chakrabarty*, 447 U.S. at 310.

To be clear, the Court sees reason to question whether the 911 Patent claims anything novel, useful, or nonobvious.  (*See* Part III.A.3.a, above.)  But, as far as the *Alice* inquiry goes, the 911 Patent is not "directed to" an unpatentable law of nature, a natural phenomenon, or an abstract idea.  It is instead "directed to" a non-naturally occurring delivery method of naturally occurring chemicals in (as far as the record reveals) non-naturally occurring proportions and concentrations.

Because the 911 Patent does not fail at step one of the *Alice* inquiry, the Court need not address step two.

## B.    Claim 31

Pure Hemp brings a separate argument against Claim 31.  That Claim reads as follows: "The [liquid cannabinoid] formulation of any one of the [preceding] claims, wherein the formulation is infused in a medium chain triglyceride (MCT)."[3]  This sort of

---

[3] Claim 31 originally said "proceeding" where the Court has inserted "preceding."  The Patent Act requires that "a claim in dependent form shall contain a reference to a claim

claim is known in the Patent Act as a "multiple dependent claim."  35 U.S.C. § 112(e).

"A multiple dependent claim shall not serve as a basis for any other multiple dependent

claim."  *Id.*  Pure Hemp notes that two "preceding claims" are themselves multiple

dependent claims, namely, Claim 9, which depends on either of Claims 1 or 5; and

Claim 24, which depends on either of Claims 16 or 20.  (ECF No. 32 at 15.)  Pure Hemp

therefore argues that Claim 31 must be held invalid as a multiple dependent claim

connected to a multiple dependent claim.  (*Id.*)

The Patent Act states that "[a] patentee . . . may . . . make disclaimer of any

complete claim . . . .  Such disclaimer shall be in writing, and recorded in the Patent and

Trademark Office; and it shall thereafter be considered as part of the original patent

. . . ."  35 U.S.C. § 253(a).  In response to Pure Hemp's argument, UCANN invoked this

procedure to disclaim Claims 9 and 24.  (ECF No. 36-13.)  "A statutory disclaimer under

35 U.S.C. § 253 has the effect of canceling the claims from the patent and the patent is

viewed as though the disclaimed claims had never existed in the patent."  *Guinn v.

Kopf*, 96 F.3d 1419, 1422 (Fed. Cir. 1996).  One would expect that this would end the

argument as to Claim 31.

Pure Hemp's reply brief, however, insists that the Court can still declare Claim 31

invalid as a multiple dependent claim that relies on multiple dependent claims, even

though those underlying multiple dependent claims are now deemed nonexistent.  (ECF

No. 38 at 11–12.)  Pure Hemp relies on *Rembrandt Wireless Technologies, LP v.*

---

*previously* set forth and then specify a further limitation of the subject matter claimed."
35 U.S.C. § 112(d) (emphasis added).  Obviously, referring to "proceeding claims" fails this
requirement, and Pure Hemp requested summary judgment of invalidity on this basis, among
others.  (ECF No. 32 at 12–15.)  UCANN has since obtained a certificate of correction from the
U.S. Patent & Trademark Office ("PTO"), stating that "proceeding" should read "preceding."
(ECF No. 52-2.)  Accordingly, the § 112(d) invalidity argument is moot.

*Samsung Electronics Co.*, 853 F.3d 1370 (Fed. Cir. 2017).  In *Rembrandt*, the plaintiff

accused the defendant of infringing two claims of its patent, which the Court will call

"Claim A" and "Claim B," to avoid confusion with any claim at issue between UCANN

and Pure Hemp.  As it turned out, one of the plaintiff's licensees had been selling

products incorporating Claim B without marking those products as patent-protected.  *Id.*

at 1382.  This potentially entitled the defendant to a limitation on damages, because the

Patent Act states that "[i]n the event of failure so to mark, no damages shall be

recovered by the patentee in any action for infringement, except on proof that the

infringer was notified of the infringement and continued to infringe thereafter, in which

event damages may be recovered only for infringement occurring after such notice."

35 U.S.C. § 287(a).

    The defendant asserted that it had no notice of the plaintiff's patent until the

lawsuit itself, and apparently the plaintiff did not contest this assertion.  *Rembrandt*, 853

F.3d at 1382.  Accordingly, the defendant moved to limit the plaintiff's damages.  *Id.*

Eight days later, the plaintiff disclaimed Claim B, electing to proceed only under Claim

A.  *Id.*  The district court accepted this maneuver and allowed the plaintiff to seek

damages further back in time than the failure-to-mark limitation would allow.  *Id.* at

1382–83.  The Federal Circuit reversed: "while we have held that a disclaimer

relinquishes the rights of the patent owner, we have never held that the patent owner's

disclaimer relinquishes the rights of the public."  *Id.* at 1383–84.  Nonetheless, due to

proceedings in the district court that interrupted briefing on the matter, the Federal

Circuit remanded to the district court to decide whether a failure to mark limits damages

under *any* claim of the patent—such that damages under Claim A should not have been

awarded before the date the plaintiff filed a lawsuit—or whether a failure to mark only limits damages flowing from the claim embodied by the unmarked product. *Id.* at 1384–85.

Pure Hemp argues that "[s]imilar public notice concerns undergird the [multiple dependent] requirements of [35 U.S.C. § 112(e)]." (ECF No. 38 at 11.) Pure Hemp contends that there must be "clear public notice" of invalidity. (*Id.* at 12.) This is circular. Claim 31 is *not* invalid anymore, at least not on account of the multiple dependency problem that existed before UCANN's disclaimer.

Even if Claim 31 were invalid, however, a ruling from this Court would not serve as clear public notice of that. The PTO would not reissue the 911 Patent with Claim 31 crossed out, for example. Those using databases like Westlaw and LexisNexis would see a red flag or stop sign icons, but that is hardly *public* notice.

In short, there is neither a good reason nor a statutory basis to declare Claim 31 invalid, even though it *previously* depended on multiple dependent claims. The Court therefore rejects this argument.

## IV. CONCLUSION

For the reasons set forth above, Pure Hemp's Early Motion for Partial Summary Judgment (ECF No. 32) is DENIED.

Dated this 17th day of April, 2019.

BY THE COURT:

_____
William J. Martinez
United States District Judge